## AFFIDAVIT OF SEAN E. BALCOM

I, Sean E. Balcom, being duly sworn, depose and state as
follows:

1.   I am a Detective-Sergeant for the Barnstable Police
Department, and am currently assigned to the United States Drug
Enforcement Administration ("DEA") Cape Cod Task Force ("CCTF")
as a Federal Task Force Agent.   I have been so assigned for the
past four years.   As a duly deputized Task Force Agent, I am an
"investigative or law enforcement officer of the United States"
within the meaning of Section 2510(7) of Title 18, United States
Code, that is, an officer of the United States who is empowered
by law to conduct investigations of and to make arrests for
offenses enumerated in Section 2516, Title 18, United States
Code.   Prior to my employment with DEA, I was employed in varying
capacities with the Barnstable Police Department for the past 15
years.   I have earned a Bachelor's degree in Administration of
Justice from Roger Williams University, as well as a Master's
degree in Criminal Justice from Anna Maria College.

2.   During my employment with the Barnstable Police
Department, I have participated in numerous investigations
relating to the distribution of controlled substances, including
cocaine, crack cocaine, heroin, and other substances in violation
of the federal anti-drug laws, including Title 21, United States
Code, Section 846.   I have also operated in an undercover
capacity in investigations involving the distribution of cocaine

EXHIBIT
A
04m - 1049-

and heroin in and around southeastern Massachusetts. I have also assisted in numerous other investigations in different capacities, such as surveillance, execution of search warrants, execution of arrest warrants and other investigative methods. Those investigations have resulted in arrests and convictions for violations of the drug laws, seizures of drugs, firearms, and real estate, and forfeiture of money, vessels, and motor vehicles.

3.    I have received training in the field of narcotics enforcement and investigations from the Massachusetts Criminal Justice Training Council Police Academy, Barnstable, Massachusetts, and graduated in May of 1989. I received basic narcotics training in the Academy, and I have had supplemental training in the recognition and detection of illegal narcotics and the apprehension of narcotics offenders. I have attended specialized schools on street level narcotics investigations, confidential informants, search warrants, drug interdiction, criminal procedure, telecommunications exploitation and narcotics task force operations. Through my training, education and experience, I have become familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the trafficking of illegal drugs. I have also become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the methods of payment for such

2

drugs.  I am also familiar with various items used to compound,
process, deliver and serve as containers for cocaine, heroin, and
other controlled substances.  Specifically, I am aware that drug
traffickers commonly use cellular telephones in furtherance of
their drug trafficking activities and frequently change cellular
telephone numbers and cellular telephones in an effort to thwart
law enforcement's use of electronic surveillance.  I also am
familiar with the manner in which narcotics traffickers use
telephones, coded, veiled, or slang-filled telephone
conversations, pagers, coded pager messages, and other means to
facilitate their illegal activities.  I also am familiar with the
vernacular or street-names for users and distributors of
controlled substances and the methods by which such persons
attempt to disguise the subjects of their conversations and
operations.

        4.    I submit this affidavit in support of a criminal
complaint charging CHRISTOPHER T. CUSTER ("CUSTER"), CARMEN
FIGUEROA ("FIGUEROA"), DESIREE ALVES ("ALVES") and WILLIAM TEJEDA
("TEJEDA") with conspiracy to possess with intent to distribute,
and to distribute, cocaine, in violation of 21 U.S.C. Section
841(a)(1) and Section 846.  For the reasons set forth below, I
believe that there is probable cause to believe that these
individuals have committed the said violations in the District of
Massachusetts.  The defendants are further described as follows:

3

a.  **CUSTER**:  CUSTER is a white male who is
approximately 5'8" tall and weighs approximately 155
pounds.  He has a light complexion, brown hair and
brown eyes.  It is believed that CUSTER resides at 18
Murphy Road, Hyannis, Massachusetts.  CUSTER has a
criminal record which includes a conviction in
Barnstable District Court on October 17, 2001, for
possession with intent to distribute marijuana.

b.  **FIGUEROA**: FIGUEROA is a female with a date of
birth of April 11, 1979.  She uses social security
number of 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.  Based upon records obtained
from the Massachusetts Registry of Motor Vehicles, she
is approximately 5'1" tall and resides at 90 Sandwich
Road, Apt. 9, Bourne, Massachusetts.  FIGUEROA has
brown hair and brown eyes, and a medium complexion.
She utilizes a dark green 1995 Infiniti Q45, with
Massachusetts registration number 3526LP.  FIGUEROA has
a minor  criminal record.

c.  **ALVES**:  ALVES is a black female who is
approximately 5'3" tall and weighs approximately 110
pounds.  ALVES has a date of birth of October 14, 1980
and is assigned social security number 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.  It
is believed that she resides at 299 Camp Street, West
Yarmouth, Massachusetts.  It is believed that ALVES

4

uses a telephone assigned the number (508) 771-2912
subscribed in her name at 299 Camp Street.  ALVES does
not have a criminal record.

d.  **TEJEDA**:  TEJEDA is a Hispanic male, approximately
6 feet tall and at least 200 pounds.  He was born on
August 15, 1976 and uses social security number 583-67-
3533.  It is believed that he resides at 1234 Boston
Road, Bronx, New York.  He appears to have no criminal
history record.

5.  I further submit this Affidavit in support of the
issuance of search warrants for the following locations:

> a.  **18 Murphy Road, Hyannis, Massachusetts**, which is
> more particularly described in "18 Murphy Road -
> Attachment A" of the accompanying search warrant
> application (hereinafter "18 Murphy Road");

> b.  **299 Camp Street, W. Yarmouth, Massachusetts**, which
> is more particularly described in " 299 Camp Street -
> Attachment A" of the accompanying search warrant
> application (hereinafter "299 Camp Street"); and,

> c.  **90 Sandwich Road, Apt. 9, Bourne, Massachusetts**,
> which is more particularly described in "90 Sandwich
> Road, Apt. 9 - Attachment A" of the accompanying search
> warrant application (hereinafter "90 Sandwich Road").[1]

---

[1]Although the cell phone providers list Carmen FIGUEROA'S
address as Apt. 9-C, FIGUEROA reported her address to the Bourne
Police Department on February 15, 2004 as Apt. 9-D.  A Bourne
detective assigned to this investigation reported to the premises
on February 15, 2004, and spoke with FIGUEROA in her apartment.
He reported that the door to the apartment was identified with
the number "9."  He also reported that FIGUEROA's apartment was
the only one identified with the number "9."

> d.  **110 LaFrance Avenue, Hyannis, Massachusetts**: which is more particularly described in "110 LaFrance Ave. - Attachment A" of the accompanying search warrant application (hereinafter "110 LaFrance Ave.").

(collectively "the Target Locations"). For the reasons set forth below, I submit that there is probable cause to believe that the Target Locations contain evidence of the above-described offenses.

6.   I further submit this Affidavit in support of the issuance of a seizure warrant for one vehicle identified as follows:

> a.   a Green Infinity Q45 sedan, bearing vehicle identification number ("VIN") JNKNG01D8SM300236. The vehicle currently is assigned Massachusetts Registration number 3526LP and is registered to Carmen L. FIGUEROA, 90 Sandwich Road, Bourne, Massachusetts.

As detailed below, I have probable cause to believe that the subject vehicle was used to transport, or to facilitate the transportation , sale, receipt, possession or concealment of controlled substances, in violation of 21 U.S.C. §§ 846 and 841, and therefore is property subject to seizure pursuant to 21 U.S.C. §§ 853 and 881.

7.   I have included in the Affidavit only those facts which I believe establish the requisite probable cause for the issuance of the requested complaint and warrants. These facts are either personally known to me, or have been related to me by other federal, state, or local law enforcement officers or employees. The information contained in this Affidavit is submitted for the

6

sole purpose of supplying probable cause for the issuance of the requested complaint and warrants.  Accordingly, this Affidavit does not contain all of the information known to me regarding this criminal investigation.

**Background of the Investigation**

8.    In approximately December, 2002, as part of a homicide investigation, law enforcement officials listened to telephone calls made by an individual named Manuel Mendes ("Mendes"), who was incarcerated at the Plymouth House of Corrections ("PHOC"). MENDES is currently serving a term of eight to ten years, plus one day, arising out of a state conviction for trafficking between 28-100 grams of cocaine.  While listening to these telephone calls, it appeared that MENDES continued to operate his cocaine business behind the prison walls.  He did so telephonically by speaking to CUSTER, ALVES and FIGUEROA and directing them as to the distribution of cocaine and maintenance of the drug proceeds.

9.    Based upon this, and other information, on January 29, 2004, the United States District Court (Lindsay, J) authorized the interception of wire communications on four telephones: FIGUEROA's residential telephone at 90 Sandwich Road; a Nextel cellular telephone subscribed to and utilized by her; a T-Mobile cellular telephone also subscribed to and utilized by her; and a Nextel cellular telephone subscribed to and utilized by CUSTER.

7

Interceptions commenced on February 2, 2004, and ceased on March 2, 2004.

10.   On March 4, 2004, the United States District Court (Lindsay, J) authorized the continued interception of wire communications on three of the four telephones that were initially authorized: FIGUEROA's residential telephone at 90 Sandwich Road; the T-Mobile cellular telephone also subscribed to and utilized by her; and a Nextel cellular telephone subscribed to and utilized by CUSTER. Interceptions of these three telephones commenced on March 4, 2004, and continue as of the date of this Affidavit.

11.   During the course of both wiretaps, FIGUEROA had approximately 88 intercepted pertinent telephone conversations (as of March 10, 2004). Based upon the evidence obtained in this investigation, it appears that FIGUEROA is an associate of MENDES who collects narcotics proceeds, facilitates communications between MENDES and other members of his organization, including TEJEDA and CUSTER, and processes and packages cocaine.

12.   During the course of both wiretaps, CUSTER had approximately 369 intercepted pertinent telephone conversations (as of March 10, 2004). Based upon the evidence obtained in this investigation, it appears that CUSTER is an associate of Manuel Mendes, who is responsible for a number of different activities, including obtaining quantities of cocaine from the supplier in

8

New York and distributing narcotics to customers and collecting drug proceeds.

13. During the course of both wiretaps, ALVES had approximately 44 intercepted pertinent telephone conversations (as of March 10, 2004). Based upon the evidence obtained in this investigation, it appears that ALVES allows her residence to be used to process, package and store cocaine. It also appears that she collects and/or holds drug proceeds for Mendes and CUSTER.

14. During the course of both wiretaps, approximately 4 conversations were intercepted between the source of supply and FIGUEROA and the source of supply and CUSTER. On February 16, 2004, CUSTER spoke to the source of supply. The next day, on February 17, 2004, law enforcement observed TEJEDA meet with CUSTER in a red van in New York City (the nature of this meeting is described further in paragraphs 22-27, below). Based upon the evidence obtained during this investigation, it appears that TEJEDA is the source of supply for the organization, and that he supplies CUSTER with approximately 500-1,000 grams of cocaine every two to three weeks.

## ALVES and FIGUEROA TRANSPORT NARCOTICS TO 18 MURPHY ROAD

15. On February 14, 2004, at approximately 3:53 pm, CUSTER was intercepted talking to ALVES. CUSTER stated that he was not going to be at his house and instructed ALVES to "just come in the yard and open my truck". CUSTER then told ALVES to "put two

9

of them in the glove box." CUSTER ended the conversation stating
he just had to run and do a couple of errands and that he would
come back to his house and "give that to him that way I won't
miss this money." At 4:05 p.m., CUSTER was observed by law
enforcement exiting 18 Murphy Road and driving away. Based upon
my training, experience and knowledge of this investigation, I
believe that when CUSTER referred to "two of them," that he was
referring to a quantity of cocaine.

16. At approximately 4:10 p.m., law enforcement officials
observed ALVES and FIGUEROA exit 299 Camp Street and enter an
Infinity bearing Massachusetts registration number 3526 LP,
FIGUEROA's vehicle. The vehicle was then observed by other law
enforcement driving to 18 Murphy Road. When it arrived, the
vehicle pulled into the driveway, and ALVES exited. She
proceeded to walk to the pick up truck behind 18 Murphy Road and
open and shut the passenger's door of the truck. She then
reentered the Infiniti, which then departed.

**BREAK-IN AT FIGUEROA'S HOUSE ON FEBRUARY 15, 2004**

17. On February 15, 2004, FIGUEROA reported to the Bourne
Police Department that her residence at 90 Sandwich Road, Apt.
9D, Bourne, Massachusetts had been broken into and that $600 and
a man's watch had been stolen. At approximately 6:38 p.m.,
FIGUEROA and Mendes discussed the "real" amount that was taken
from the safe, which FIGUEROA said was "6 and Jordan's 5,"

10

meaning $6,000 and possibly another $5,000 of Jordan's money
(Jordan is Mendes' younger son).  Later in the conversation,
Mendes stated "thank God I moved that change."  I believe this
conversation meant that FIGUEROA maintained at least $6,000 at 90
Sandwich Road, Apt. 9, but that Mendes had already made
arrangements to have the remainder of his money moved from
FIGUEROA's apartment.

18.  On February 17, 2004, in another conversation between
MENDES and FIGUEROA, Mendes asked FIGUEROA at least twice whether
she got something from under the sink.  They also discussed a
"key," which could have meant either a kilogram of cocaine or a
key, that ALVES had.  FIGUEROA told MENDES that she did not have
it in a safe place.

**CUSTER AND PAVAO's MEETINGS WITH TEJEDA IN NEW YORK**

19.  During the course of the investigation, and based upon
a review of telephone calls from the PHOC between and among
MENDES, FIGUEROA and CUSTER, it was learned that CUSTER
replenishes the supply of cocaine approximately every two to
three weeks by meeting with TEJEDA in New York City.  When making
these trips CUSTER generally uses a rental vehicle, rather than
using his own vehicle.  Records from the Avis car rental company
in Hyannis, Massachusetts, showed that CUSTER's mother rented a
rental vehicle on December 3, 2003 and returned it on December 5,
2003; on December 17, 2003 and returned it on December 19, 2003;

11

December 30, 2003 and returned it January 1, 2004.  The mileage
accumulated during these rental periods was 636, 658 and 596
miles, respectively.

20.  Recorded telephone calls from the PHOC during the
period between December 3 and 5, 2003 indicated that CUSTER made
a trip to New York to obtain a supply of cocaine.  Likewise,
recorded calls from the PHOC on December 30 and 31, 2003 between
Mendes and FIGUEROA, ALVES and CUSTER indicated CUSTER had made
another trip for the same purpose.  For example, in a recorded
PHOC call on December 30, 2003, Mendes had a conversation with
ALVES.  At one point during the conversation, ALVES was
overheard speaking to CUSTER on the direct connect feature of a
telephone.  CUSTER told ALVES and Mendes that he had "4250" at
the house.  ALVES asked Mendes how much she was supposed to have,
and MENDES told her "85."  Mendes directed ALVES to use the 4250
and the 85.  During the same conversation, Mendes told ALVES that
"if dude [meaning the source of supply] call, tell him he's
coming to get five."  Mendes also stated "85 plus 4, that's it
ok."  Mendes also stated that the "dude" owed him 10, which based
upon the context of calls on December 31, 2003, I believe to be a
reference to 10 grams of cocaine.  I also believe, based upon my
training, experience and familiarity with this investigation,
that CUSTER had in his possession $4,250 of drug proceeds, and
ALVES had $8,500, and that MENDES instructed ALVES to use those

12

proceeds to purchase additional cocaine. I further believe, based upon my training, experience and familiarity with this investigation, that MENDES directed ALVES to tell the source, if he called, that CUSTER was going to pick up one-half kilogram of cocaine (approximately 500 grams), and that the cost would be approximately $12,500.

## CUSTER's TRIP TO NEW YORK CITY ON JANUARY 22, 2004

21. In January, 2004, we installed a global positioning system ("GPS") in a rental car at the Avis company. On January 22, 2004, June Bettencort, whom I know to be CUSTER's mother, rented that vehicle and proceeded to drive it from Avis to her and CUSTER's home at 18 Murphy Road. Approximately one-half hour after her return from Avis, the rental vehicle was observed being driven from 18 Murphy Road to 153 Bacon Road, Hyannis, Massachusetts, which I believe to be the residence of Jennifer Pavao ("Pavao"), CUSTER's girlfriend. The rental vehicle was being followed by another vehicle driven by Pavao. Approximately one hour later, the rental vehicle was no longer at 153 Bacon Road. The GPS system was malfunctioning at the time and we did not observe the rental vehicle leave. When the GPS became operative, it indicated the rental vehicle was on I-95 in Rhode Island. The GPS malfunctioned again when the rental vehicle was heading southbound in Southern Connecticut; the next time the GPS functioned (for a brief period), the vehicle was heading

13

northbound in Connecticut.  After the GPS was downloaded, the
information showed that the rental vehicle had traveled to New
York, and stopped for approximately 20 minutes on Boston Road,
between E. 168th Street and E. 169th Street in the Bronx, which is
the block of Boston Road where TEJEDA is believed to reside.   The
GPS showed that, upon returning to the Cape, the rental vehicle
went from New York directly to the section of Camp Street in
which 299 Camp Street, ALVES' residence, is located.

**CUSTER'S AND PAVAO'S TRIP TO NEW YORK CITY ON FEBRUARY 17, 2004**

     22.   On February 16, 2004, at approximately 8:07 p.m.,
FIGUEROA had a conversation with a male whom we believed to be
TEJEDA.   During this conversation, FIGUEROA stated that "Manny
wants to send Chris out there tomorrow."   FIGUEROA then indicated
that Mendes was on the other line.   FIGUEROA stated that "He's
gonna send him for 5 and plus um, the 70 that you owe him."
TEJEDA then told FIGUEROA to "tell [CUSTER] to be early."   The
two then appeared to discuss whether the price of the cocaine was
the same or less.   Based on my training and experience in this
investigation, FIGUEROA told the supplier, whom we believe to be
TEJEDA, that Mendes intended to send CUSTER to see TEJEDA the
next day in New York City to get 570 grams of cocaine ("5" plus
"70").

     23.   On February 17, 2004, surveillance agents traveled to
the Bronx, New York early in the morning.   Based on the GPS

14

information gathered following the January 22, 2004 trip,
surveillance agents went to the Boston Road area in advance of
the transaction.  Other surveillance agents followed CUSTER from
18 Murphy Road to New York City.  Surveillance agents observed
CUSTER and Pavao driving a white Oldsmobile Alero, Massachusetts
registration 35RM01, which was the rental vehicle from Avis in
which we installed a GPS.

24.  After CUSTER left 18 Murphy Road, surveillance agents
watched CUSTER and Pavao drive to 299 Camp Street.  Based on my
knowledge of the investigation, I believed that CUSTER and Pavao
were picking up money from ALVES for the trip to New York City
and the drug transaction with TEJEDA.  Surveillance agents then
followed them to New York City.

25.  At approximately 3:20 p.m., surveillance agent Brian
Guiney observed the Alero operated by CUSTER, with passenger
Pavao, pull up to TEJEDA's residence and park behind a red van
which was known to be utilized by TEJEDA.[2]  Special Agent Edwin
Brigantty observed TEJEDA exit 1234 Boston Road, which I believe
to be TEJEDA's residence based upon the address listed on his

----

[2]On or about February 10, 2004, this vehicle was pulled over
in a traffic stop.  The driver showed a New York State driver's
license with the name and photograph of WILLIAM TEJEDA, number
792479262, 1234 Boston Road, Bronx New York.  Special Agent Edwin
Brigantty reviewed the driver's license photograph after
observing the February 17, 2004, meeting with CUSTER and the
source of supply, and positively identified the person with whom
CUSTER met as WILLIAM TEJEDA.

driver's license, and walk to the van. Agents observed CUSTER exit the Alero and enter the red van with TEJEDA and an unidentified male. Shortly thereafter, CUSTER exited the van and returned to the Alero carrying a black bag. Based on my experience and training and knowledge of this investigation, including the telephone call on February 16, 2004, referenced in paragraph 22, above, I believe that the black bag contained the cocaine from TEJEDA. I believe that the amount of cocaine was 570 grams based upon the February 16, 2004 call described above with FIGUEROA.

26.   Immediately after returning to the Cape from New York City, CUSTER and Pavao proceeded directly to ALVES' residence at 299 Camp Street. CUSTER was observed carrying a package into the house.

27.   On February 17, 2004, several relevant calls were intercepted among FIGUEROA, CUSTER, ALVES and Mendes. The sum and substance of the calls early in the day pertained to CUSTER and Pavao's trip to New York, and the attempts by CUSTER and FIGUEROA to get in touch with "dude," whom they call the source of supply. At approximately 8:15 p.m., CUSTER and Mendes spoke. CUSTER told Mendes that he was at his [CUSTER's] house, and Mendes responded that CUSTER "jetted back quick," meaning that CUSTER returned from New York in good time. CUSTER responded that he had things to do. Earlier that afternoon and evening,

16

CUSTER had telephone conversation with several individuals, including Ed White and Abena Sumpter, in which he made arrangements to conduct narcotics transactions. For example, at 3:02 p.m., CUSTER had a conversation with an unknown male in which the UM stated he needed "two," which I believe to be a reference to cocaine. When CUSTER spoke to Abena Sumpter, who has been identified as one of CUSTER's customers, at approximately 4:05 p.m., he told her he was not in town and would be back at approximately 8:00 p.m. When CUSTER spoke to Ed White, another known customer of his, at approximately 6:50 p.m., he told WHITE he would be home in approximately one hour. Based on these telephone calls, I believe that when CUSTER told Mendes he had things to do, he was referring to possible cocaine transactions with his customers.

28. Based on the foregoing, there is probable cause to believe that the individuals currently identified as CHRISTOPHER T. CUSTER, CARMEN FIGUEROA, DESIREE ALVES, and WILLIAM TEJEDA unlawfully, knowingly and intentionally conspired with each other and with others, known and unknown, to distribute cocaine, a Schedule II controlled substance, between in or about December, 2002, through March 15, 2004, in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

**SEARCH WARRANTS**

29. Based on information contained in this Affidavit, there

17

is also probable cause to believe that evidence defined in
**Attachment B** for each Target Location, and relating to the
illegal distribution of cocaine in violation of 21 U.S.C.
§§841(a)(1) and 846, may be found at the Target Locations.

30.    I believe that inculpatory evidence of drug activities
may be found at the different Target Locations based on the
evidence set forth this in affidavit.  Moreover, in view of my
experience as an experienced narcotics investigator, a search of
these Target Locations will, likely, produce inculpatory evidence
of drug distribution activities as well as quantities of cocaine,
drug packaging materials, and U.S. currency earned through their
illegal drug distribution efforts.  In addition, discovery of
wireless telephones known to be utilized by CUSTER, ALVES and
FIGUEROA during this investigation, including specific target
telephones that were utilized during the court authorized
wiretaps, written records and other documents reflecting drug
distribution, identification documents, telephone books,
Rolodexes, address books, and other lists that include the
telephone numbers of suppliers, customers, and other persons and
associates involved in drug distribution, financial records
representing monies earned (or assets purchased) through the
organization's drug distribution activities, records relating to
the purchase and sale or ownership of vehicles utilized by these
individuals in carrying out their drug activities, records

18

evidencing the expenditure of funds obtained from drug trafficking, including bills and receipts reflecting purchases, and other documents representing illegally earned proceeds obtained from drug trafficking, including bank account records, bank books, checks, bank drafts, and other financial account information, as well as other items detailed in **Attachment B**, may also be found at Target Locations.

31.    I expect to find such items at the Target Locations because, in my experience, it is the practice of drug dealers and their close associates to maintain quantities of drugs, drug paraphernalia, U.S. currency, and financial records, ledgers, and other writings evidencing their illegal drug trafficking activities in safe, secure, and private places and locations like their homes, apartments, businesses, offices, and other leased or owned locations where their privacy can be maintained.

32.    Record keeping, in particular, is critical to drug dealers in order to keep close track of monies paid and monies owed so that the drug organization can stay profitable and remain in business.  In addition, to be of help and value to a drug dealer, such records need to be maintained where they are most easily accessible and, therefore, at secure locations such as their homes, residences, places of business or employment, or, perhaps, at some other location where that person has either an ownership or leasehold interest.  Drug traffickers, especially

19

those that purchase drugs on consignment, also commonly keep "pay and owe" and other day-to-day financial records that reflect balances due (suppliers) for drugs purchased, and payments expected (customers) at these same locations.  Such records can, frankly, only assist the drug distributor if they are accessible to him/her at the types of locations defined above.

33.   In addition, based upon my training and experience, I know that narcotics traffickers sometimes conceal their drugs, drug paraphernalia, currency, records, and other items at locations other than their residences, or locations appurtenant to their residences, and sometimes use multiple stash houses to store these items.  When narcotics traffickers store these items elsewhere, such as in storage areas appurtenant to an apartment or condominium unit, safe deposit boxes, units at commercial storage facilities, lockers, stash houses or other locations within their dominion and control, they often maintain evidence of their dominion and control of the other location at their residences.  Such evidence includes keys to storage facilities, safe deposit boxes or residences and/or documents reflecting ownership, rental interest or dominion and control over the other residences, safe deposit boxes, storage facilities or similar locations.

## 18 MURPHY ROAD, HYANNIS, MASSACHUSETTS

34.   Based upon the investigation to date, there is probable

20

cause to believe that CUSTER resides at 18 Murphy Road with his mother and sister. Records from the Registry of Motor Vehicles indicate that CUSTER uses an address of 18 Murphy Road, Hyannis, Massachusetts. Surveillance has observed CUSTER entering and exiting the premises on countless occasions, including a time (as more fully described in the next paragraph) when CUSTER was intercepted and confirmed he was at the "crib," which I know is a slang term to mean someone's home. In addition, as set forth in paragraph 16, above, on February 14, 2004, ALVES and FIGUEROA traveled to CUSTER's home, as directed by him, and went directly to 18 Murphy Road. As set forth in paragraphs 29 through 33, because 18 Murphy Road appears to be the residence of CUSTER, an active narcotics trafficker involved in an ongoing criminal conspiracy with a number of other individuals, there is probable cause to believe that certain documents and other evidence related to narcotics trafficking and the disposition of narcotics proceeds may be located inside the residence.

35. In addition to being CUSTER's residence, other information obtained during the investigation suggests that 18 Murphy Road may contain evidence related to narcotics trafficking. Evidence suggests that CUSTER stores quantities of drugs at 18 Murphy Road as he was observed on several occasions departing his residence and proceeding directly to a suspected narcotics transaction. For example, on February 3, 2004, at approximately 7:51 p.m., Mendes and CUSTER had a conversation in which MENDES asked CUSTER whether he was going out or staying at

21

the "crib," which I believe to be a slang word for "home."
During this call, CUSTER was observed by surveillance agents to
be at 18 Murphy Road. During the call, Mendes asked CUSTER if he
had "two" over there, and asked if he [CUSTER] "finished that one
too?" CUSTER responded that he was working on them. Based upon
my training, experience and familiarity with this investigation,
I believe that the "two" to which Mendes referred was a reference
to a quantity of cocaine that CUSTER was attempting to sell.

    36.   Further, on February 20, 2004, at approximately 1:34
p.m., law enforcement intercepted a telephone call from an
unknown male ("UM") to CUSTER. The UM was using a telephone
assigned the number (508) 367-2701, subscribed to Peter Sisson at
11 Captain Studley Road, Marston Mills, Massachusetts. During
the call, the UM asked CUSTER how long it would take to get out
there, and CUSTER asked the UM how much he had. The UM responded
"150," which I believed to mean $150. CUSTER told the UM he
would be there shortly.

    37.   At approximately 2:56 p.m., law enforcement officers
observed CUSTER leave 18 Murphy Road in a black Eclipse bearing
Massachusetts registration 2203YJ. CUSTER was observed driving
directly to Whites Lane, Marstons Mills, MA. At approximately
3:34 p.m., CUSTER contacted the same UM referenced above. The UM
told CUSTER he had $175, and CUSTER told the UM to come outside.
At approximately 3:36 p.m., CUSTER is observed turning onto
Whites Lane, which is a small dead end street. Approximately
five minutes later, CUSTER was observed driving out of Whites

22

Lane.

38.   On February 24, 2004, at approximately 7:31 p.m.,
CUSTER received a telephone call from Abena Sumpter ("Sumpter"),
who was using a telephone assigned the number (508) 420-5516.  In
summary, she asked if CUSTER would do something for "35," and
CUSTER said she would have to wait until he got a ride.  Sumpter
said she would call back at around 9:00 p.m.  At approximately
9:47 that evening, she spoke to CUSTER again, and the two agreed
to meet at "the hotel."  At approximately 9:48 p.m., law
enforcement observed CUSTER leave 18 Murphy Road in an Isuzu
Trooper.  He was followed directly to the Heritage House Hotel on
Main Street, Hyannis, Massachusetts, which I know to be adjacent
to Sumpter's residence.  CUSTER pulled into the lot at
approximately 9:55 p.m., and, one minute later, he was observed
leaving the lot, turning around on an adjacent street and
proceeding directly back to 18 Murphy Road.

39.  Based upon my training, experience and knowledge of
this investigation, I believe that on February 3 and 24, 2004,
CUSTER made arrangements to meet with these individuals to
conduct a drug transaction.  In both of these transactions,
CUSTER proceeded directly to the drug transactions from 18 Murphy
Road and returned to 18 Murphy Road directly after the
transactions.  I believe that this pattern of activity suggests
that 18 Murphy Road is used by this narcotics trafficking
organization to store drugs and drug proceeds.  Further, because
CUSTER has direct and daily contact with narcotics customers and

associates, there are likely to be documents and other items
located at the residence which demonstrate his relationship with
these individuals and with these items.

40.  Based upon the foregoing, and based upon my training
and experience, there is probable cause to believe that the
premises at 18 Murphy Road, Hyannis, Massachusetts, presently
contain the items set forth in "18 Murphy Road - Attachment B,"
which contain evidence of a commission of a criminal offense,
contraband, the fruits of crime, things otherwise criminally
possessed, and property designed or intended for use or which is
or has been used as a means of committing a criminal offense,
specifically, violations of Title 21, United States Code.
Sections 846 and 841(a)(1).

**299 Camp Street, West Yarmouth, Massachusetts**

41.  Based upon the foregoing, there is probable cause to
believe that ALVES resides at 299 Camp Street, West Yarmouth,
Massachusetts, with her children.  Telephone records indicates
that a telephone is subscribed to ALVES' name at 299 Camp Street.
Surveillance has observed ALVES entering and exiting 299 Camp
Street on numerous occasions.  Records from the Massachusetts
Registry of Motor Vehicles indicate that ALVES' address is 299
Camp Street, West Yarmouth, Massachusetts.  The contents of
intercepted telephone calls have suggested that ALVES resides
there.  As set forth on paragraphs 29 through 33, because 299
Camp Street appears to be the residence of ALVES, an active
narcotics trafficker involved in an ongoing criminal conspiracy

24

with a number of other individuals, there is probable cause to
believe that certain documents and other evidence related to
narcotics trafficking and the disposition of narcotics proceeds
may be located inside the residence.

42.  In addition to that being ALVES' residence, other
information obtained during the investigation suggests that 299
Camp Street may contain evidence related to the narcotics
trafficking conspiracy.  On January 22, 2004, after returning to
the Cape from New York, CUSTER drove directly to the area on Camp
Street where 299 is located.  Also, on February 17, 2004, CUSTER
and Pavao stopped at 299 Camp Street immediately before getting
on the highway to New York, and, after returning to the Cape from
New York, they went directly to 299 Camp Street.  Further, as
mentioned in paragraph 16, above, ALVES delivered a quantity of
cocaine from 299 Camp Street to CUSTER's residence at 18 Murphy
Road.

43.  In addition, the following intercepted telephone calls
indicate that ALVES stores drugs and drug proceeds at her
residence

> a.  On February 7, 2003, FIGUEROA had a one minute
> conversation with ALVES.  During the call, FIGUEROA
> asked ALVES, "what did you get me," and ALVES responded
> "980."  ALVES then proceeded to tell FIGUEROA that
> when Chris, meaning CUSTER, gave her the money, he was
> "twenty dollars short," and, after a brief discussion
> about how CUSTER was "smoking," said that she told him

25

[CUSTER] when he was "handling Manny's money," meaning
Mendes, that he should not be high.  FIGUEROA agreed
and told ALVES to "do something because he can't be
f*** up" and that he was going to "be cut off pretty
soon if he keeps doing that."  During this call, it
appears that CUSTER turned over $980 of drug proceeds
to ALVES, who then intended to give it to FIGUEROA.  It
also appeared that both ALVES and FIGUEROA considered
that the drug proceeds belonged, at least in part, to
MENDES.

b.   On February 9, 2004, Mendes and FIGUEROA had a
conversation, in which Mendes told FIGUEROA that if he,
meaning CUSTER, left something with "her," referring to
ALVES, FIGUEROA should "just grab it."

c.   On March 9, 2004, FIGUEROA and Mendes had a
conversation, in which the two referred to a box, which
contained some items.  FIGUEROA stated that she was
scared to leave it (at the time, FIGUEROA was speaking
on her residential telephone at 90 Sandwich Road).
Mendes asked FIGUEROA if the box contained "dinero,"
which I know is the Spanish word for money, and
FIGUEROA responded affirmatively.  Mendes eventually
told FIGUEROA to take the box to Des', meaning ALVES.
Surveillance then observed FIGUEROA driving to 110
LaFrance Avenue, where Mendes' mother and children
reside, and picking up some children.  After a stop at

26

McDonald's, FIGUEROA drove to 299 Camp Street and

entered the residence carrying an object.

Based upon my training, experience and knowledge of this

investigation, I believe that this pattern of activity suggests

that 299 Camp Street is used by this narcotics trafficking

organization to store drugs and drug proceeds. Because ALVES

appears to work closely with FIGUEROA and CUSTER, and stores

these items at her house, there are likely to be documents and

other items located at the residence which demonstrate her

relationship with these individuals and with these items.

44. Based upon the foregoing, and based upon my training

and experience, there is probable cause to believe that the

premises at 299 Camp Street, West Yarmouth, Massachusetts,

presently contain the items set forth in "299 Camp Street -

Attachment B," which contain evidence of a commission of a

criminal offense, contraband, the fruits of crime, things

otherwise criminally possessed, and property designed or intended

for use or which is or has been used as a means of committing a

criminal offense, specifically, violations of Title 21, United

States Code. Sections 846 and 841(a)(1).

**90 SANDWICH ROAD**

45. There is probable cause to believe that FIGUEROA

resides at 90 Sandwich Road, Apt. 9, Bourne, Massachusetts.

Telephone records indicate that her residential line and a Nextel

telephone are subscribed to FIGUEROA's name at 90 Sandwich Road,

Apt. 9-C, Bourne, MA. Records from T-Mobile indicate that

27

another cellular telephone is registered to her name at 90
Sandwich Road, Apt. 9-C, Buzzards Bay, Massachusetts.  On
February 15, 2004, FIGUEROA reported to the Bourne Police
Department that her residence at 90 Sandwich Road, Apt. 9D,
Bourne, Massachusetts had been broken into, and the reporting
detective entered FIGUEROA's apartment which had the numeral "9"
on the door.  However, a telephone conversation intercepted on
March 8, 2004, indicated that FIGUEROA intends to change her
residence in the near future and I have learned that her children
have already changed schools.  Nonetheless, as of the date of
this Affidavit, FIGUEROA continues to maintain her residence at
90 Sandwich Road, Apt. 9.  As set forth on paragraphs 29 through
33, because 90 Sandwich Road, Apt. 9, appears to be the residence
of FIGUEROA, an active narcotics trafficker involved in an
ongoing criminal conspiracy with a number of other individuals,
there is probable cause to believe that certain documents and
other evidence related to narcotics trafficking and the
disposition of narcotics proceeds may be located inside the
residence.

     46.  Other evidence obtained during the investigation
suggests that 90 Sandwich Road, Apt. 9, may contain evidence
related to the narcotics trafficking conspiracy.  As set forth
above, on February 15, 2004, FIGUEROA reported to the local
police that $600 was stolen from her home, yet the intercepted
calls on that day indicated that the sum stolen was much greater.
Likewise, numerous other telephone conversations suggest that

drug proceeds are delivered to her and then stored at her residence. The ongoing nature of these telephone calls suggest that this is a continuous practice of these coconspirators. For example,

a. on September 9, 2003, Mendes and FIGUEROA had several conversations in preparation for a trip to New York that CUSTER intended to make the next day. Mendes told FIGUEROA that they needed to "pick extra shit up," which I believe to be a reference to obtaining additional quantities of cocaine. After a brief discussion between Mendes and FIGUEROA regarding the numbers - 4, 10, seven plus seven, 14 - FIGUEROA stated that "I'm talking about in the thing, I'm not talking about the other shit." She further explained that "in the lock, I only keep the shit that comes in and out, the other shit is put away somewhere else, so in the thing, what's in there," to which MENDES responded "14." Based upon my training, experience and familiarity with this investigation, I believe that during this portion of the conversation, FIGUEROA and MENDES were speaking about two separate sums of money which are maintained by FIGUEROA at her residence. After further discussion, MENDES stated that "listen to me, in that thing is 14 right, so I need 1 plus ½, 24 plus 12 equals 36 altogether." Based upon my training, experience and knowledge of this investigation, I

29

believe that MENDES told FIGUEROA that they needed to
obtain a kilogram and a half of cocaine, at a total
purchase price of $36,000 ($24,000 per kilogram)., c
b.    On February 9, 2004, at approximately 6:55 p.m.,
Mendes spoke to FIGUEROA, who was using her residential
land line.  Mendes asked FIGUEROA "did you get that
money from her?"  FIGUEROA reported that "She gave me,
um, nine, and I have eight-fifty left...why was it only
nine and it wasn't one?".  MENDES answered "Cause Chris
only gave her nine.  Didn't she tell you?"  I believe
this conversation references CUSTER giving ALVES nine
hundred dollars and MENDES inquiry as to whether
FIGUEROA received this $900 from ALVES, presumably from
the sale of cocaine.  Then in another conversation
later that day, at approximately 7:55 p.m., Mendes
asked FIGUEROA if she did what he told her, and
FIGUEROA responded "I'm not gonna forget, you said put
f***** five with that other five, and make that another
one", meaning she was to put two sums of five hundred
dollars together to make one thousand, presumably
packaging money related to drug transactions.

47.  Based upon the foregoing, and based upon my training
and experience, there is probable cause to believe that the
premises at 90 Sandwich Road, Apt. 9, Bourne,, Massachusetts,
presently contain the items set forth in "90 Sandwich Road, Apt.
9 - Attachment B," which contain evidence of a commission of a

criminal offense, contraband, the fruits of crime, things
otherwise criminally possessed, and property designed or intended
for use or which is or has been used as a means of committing a
criminal offense, specifically, violations of Title 21, United
States Code. Sections 846 and 841(a)(1).

**110 LAFRANCE AVENUE**

48.   110 Lafrance Ave is the residence of Mendes' mother
(Tyianne), brother (Andy) and at least one of his children
(Jordan).  CUSTER is observed at this residence on a daily basis.
Based upon the investigation to date, there is probable cause to
believe that 110 LaFrance Ave, Hyannis, Massachusetts may contain
evidence related to narcotics trafficking.  Evidence suggests
that CUSTER and Mendes may be storing quantities of drugs and/or
U.S. currency at this residence as he (CUSTER) has been observed,
on more than one occasion, departing this residence and
proceeding directly to a suspected narcotics transaction.

49.   For example, on February 10, 2004, at approximately
2:53 p.m., CUSTER, who was at 110 Lafrance Ave, received a phone
call from Ed White.  During the call, White told CUSTER he had
"fifty".  CUSTER and White then agreed to meet at the Frisbee
golf course in Marstons Mills, MA.  At approximately 3:48 p.m.,
surveillance officers observed CUSTER depart 110 Lafrance Ave and
travel directly to the Frisbee golf course to meet with White.
This meeting was observed by law enforcement officers and
occurred in CUSTER's vehicle.  Following the meeting,
surveillance officers followed CUSTER directly back to 110

Lafrance Ave.

50.  Further, on February 13, 2004, at approximately 8:33 p.m. and 8:50 p.m., CUSTER received two phone calls from Ed White.  During the first call, White asked CUSTER for a "hundred".  During the second call, White inquired when CUSTER will be at White's location.  At approximately 9:26 p.m., surveillance observed CUSTER and PAVAO exit 110 LaFrance Ave and enter the Isuzu Trooper (MA reg 1841JV).  A moving surveillance followed CUSTER and Pavao directly to Whites Lane in Marstons Mills, MA.  Approximately one minute after pulling down Whites Lane, surveillance observed the Trooper exit same and drive from the area.

51.  On February 28, 2004, at approximately 1:00 p.m. and 2:30 p.m., law enforcement intercepted two phone calls between ALVES, CUSTER and Mendes.  During the first conversation between ALVES and CUSTER, ALVES appeared to be expressing a concern of Mendes regarding a situation involving the children at 110 LaFrance Ave. and the shed on the property.  ALVES stated "he said the kids went in the thing and grabbed out the go-kart, that's not by there right?"  CUSTER responded, "na, na, the go-kart's not in the shed, it's not in there, no.  The go-kart is outside with uhm . . . where that's at, there's a lock on it and nobody can even get into it."  During the second call, Mendes spoke directly with CUSTER and instructed CUSTER to get out of the mall "so you can take care of that man because, I'm fucking, kids are out there."  CUSTER acknowledged and Mendes said "I want

32

to make sure the m****f****, they can't, they can't get to it
anyway, right." CUSTER replied, "nah, its got a lock" and "I got
the only key." There is a shed located to the rear of 110
Lafrance Ave.

52.   Moreover, on February 3, 2004, at approximately 9:16
p.m., law enforcement intercepted a phone call from an unknown
male ("UM") believed to be residing at 1927 Falmouth Rd,
Centerville, MA, to CUSTER during which the UM advised CUSTER
that he has some "change" for him.  CUSTER advised the UM that he
would be by in twenty minutes.  Consequently, surveillance was
initiated at the above address.  At approximately 9:45 p.m.,
surveillance observed a white Cadillac (MA reg. 62EA08) routinely
operated by CUSTER pull into 1927 Falmouth Rd.  Approximately
three minutes later, surveillance observed the Cadillac exit the
address and drive directly to 110 LaFrance Ave.  The occupants of
the Cadillac were identified as CUSTER and Pavao.

53.   Moreover, as mentioned in paragraph 43(c), above, on
March 9, 2004, FIGUEROA and MENDES had a conversation about where
to store a box which FIGUEROA indicated contained "dinero."  At
one point during the conversation, Mendes suggested that FIGUEROA
take the box and put it in his mother's attic.  FIGUEROA laughed
and said no.  As I stated in paragraph 43(c), they eventually
agreed to bring it to Des' (299 Camp Street).  On April 21, 2000,
I executed a state search warrant at 110 LaFrance in relation to
the case in which Mendes is currently imprisoned.  I found
approximately $80,000 in U.S currency hidden in the attic.

54.  Based upon my training, experience and knowledge of this investigation, I believe that on February 10 and 13, 2004, CUSTER made arrangements to meet with White to conduct drug transactions.  In both of these transactions, CUSTER proceeded directly from 110 LaFrance Ave to the meet locations.  I also believe that the carefully worded conversations involving the whereabouts of "that" (referenced in paragraph 51) indicate the presence of cocaine and/or US currency in the locked shed at 110 Lafrance Ave.  I believe that on March 4, 2004, CUSTER picked up U.S. currency related to a drug transaction from the unknown male at 1927 Falmouth Rd and proceeded directly to 110 LaFrance Ave. with said money.  I believe that this pattern of activity suggests that 110 LaFrance Ave. is used by this narcotics trafficking organization to store drugs and drug proceeds.  Further, because CUSTER has direct and daily contact with narcotics customers and associates, there are likely to be documents and other items located at the residence which demonstrate his relationship with these individuals and these items.

### SEIZURE WARRANT

55.  As discussed above, on February 14, 2004, FIGUEROA and ALVES used the Infiniti to transport narcotics from ALVES' residence at 299 Camp Street to CUSTER's residence at 18 Murphy Road.  Accordingly, there is probable cause to believe that the green Infiniti Q45 sedan, bearing vehicle identification number ("VIN") JNKNG01D8SM300236, currently assigned Massachusetts

34

Registration number 3526LP and registered in the name of Carmen

L. FIGUEROA, 90 Sandwich Road, Bourne, Massachusetts, constitutes

property used or intended to be used to transport, or to

facilitate the transportation, sale, receipt, possession or

concealment of controlled substances, in violation of 21 U.S.C.

Sections 846 and 841, and that the property is subject to seizure

and forfeiture pursuant to 21 U.S.C. Sections 853 and 881.

Signed under the pains and penalties of perjury this /6

day of March, 2004.


SEAN E. BALCOM
Special Agent
Drug Enforcement Administration


Sworn to and subscribed before me this /6th Day of March ,
2004.


JUDITH GAIL DEIN
United States Magistrate Judge


35